**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-02914-NYW-KAS

STEVEN GANISON,

      Plaintiff,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

This matter comes before the Court on Defendant's Motion to Strike Opinions of Plaintiff Experts Regarding Untimely Disclosed Evidence and Future Care Needs ("Motion to Strike"), [Doc. 55]; Defendant's Motion to Strike Some Opinions of Plaintiff Expert Michael Rosenberg ("Motion to Exclude"), [Doc. 56], both filed on January 26, 2024; and Defendant's Motion for Partial Summary Judgment ("Motion for Summary Judgment"), [Doc. 57], filed on February 5, 2024 (together, the "Motions"). The Court has reviewed the Motions and related briefing and concludes that oral argument would not materially assist in the resolution of the Motions. For the reasons set forth in this Order, the Motion to Strike is **GRANTED**, the Motion to Exclude is **GRANTED IN PART** and **DENIED IN PART**, and the Motion for Summary Judgment is respectfully **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

Plaintiff Steven Ganison ("Plaintiff" or "Mr. Ganison") initiated this civil action on October 17, 2022, in Adams County Court in Adams County, Colorado, asserting claims

against Defendant State Farm Mutual Automobile Insurance Company ("Defendant" or "State Farm") for breach of contract, common law bad faith, and unreasonable delay or denial of insurance benefits. *See generally* [Doc. 8]. Mr. Ganison alleges that he was injured in a hit-and-run car accident in Adams County, Colorado on October 17, 2019 (the "Accident"). Because the liable party was not found, Mr. Ganison filed uninsured/underinsured motorist ("UM/UIM") and medical payments ("MPC") claims pursuant to his insurance policy (the "Policy") with State Farm, which provides for UIM coverage and medical payments coverage up to policy limits of $100,000 and $50,000, respectively. Plaintiff alleges that State Farm led him to believe that all treatment for his Accident-related injuries would be covered under the Policy. However, State Farm paid only $25,000 to Mr. Ganison and, in September 2022, informed Plaintiff that it would only cover medical treatment through October 17, 2022.

This suit followed. Plaintiff asserts that Defendant breached its insurance contract and acted in bad faith in the handling of Plaintiff's insurance claim. *See generally* [*id.*]. State Farm removed this action from state court to this District on November 8, 2022. [Doc. 1]. On December 21, 2022, Mr. Ganison filed a proposed First Amended Complaint ("Amended Complaint"), *see* [Doc. 19-1], which this Court subsequently accepted as the operative pleading in this matter, [1] *see* [Doc. 33]. The Honorable Kristen L. Mix entered a Scheduling Order in this matter on January 23, 2023. [Doc. 31].

---

[1] Mr. Ganison attached the proposed Amended Complaint to his response to a motion to dismiss filed by Defendant. Given the Parties' representations regarding their conferral efforts as to amendment, the Court construed Defendant's failure to file a reply in support of its motion to dismiss the original complaint as consent to Plaintiff's filing of an amended complaint. *See* [Doc. 33]. Accordingly, the Court directed the Clerk of Court to separately file [Doc. 19-1] on the docket as Plaintiff's Amended Complaint, *see* [Doc. 34].

The Scheduling Order was modified by the Honorable Kathryn A. Starnella on August 29, 2023. [Doc. 47]. Pursuant to the same, Plaintiff's deadlines to designate affirmative and rebuttal experts were set for September 18 and November 14, 2023, respectively. [*Id.*]. Discovery closed on January 26, 2024. [Doc. 54]. That same day, State Farm filed its Motion to Strike and Motion to Exclude.

In the Motion to Strike, State Farm asks the Court to strike Plaintiff's Seventh Supplemental Disclosure, and the information regarding Mr. Ganison's future care needs contained therein, as untimely pursuant to Rules 26 and 37.[2] [Doc. 55]. For similar reasons, State Farm also seeks to preclude any opinion by Plaintiff's experts relating to Mr. Ganison's future care needs (and any other opinion not timely disclosed) for the same reason. The Motion to Exclude seeks to strike certain opinions set forth in the expert report of Plaintiff's retained expert, Michael Rosenberg, pursuant to Federal Rule of Evidence 702. [Doc. 56]. The Motion to Strike and the Motion to Exclude are both fully briefed. *See* [Doc. 58 (Plaintiff's Response to Motion to Strike), Doc. 65 (Defendant's Reply in support of Motion to Strike); Doc. 59 (Plaintiff's Response to Motion to Exclude); Doc. 64 (Defendant's Reply in support of Motion to Exclude)].

On February 5, 2024, State Farm filed the instant Motion for Summary Judgment. Plaintiff responded, [Doc. 63], and State Farm neither filed a reply nor sought an extension

---

[2] In the Introduction to its Motion to Strike, State Farm suggests that its Motion implicates Rule 702 of the Federal Rules of Evidence by stating that "[t]his Court extended the deadline for filing F.R.E. 702 Motions to January 26, 2024." [Doc. 55 at 1]. Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). But State Farm does not challenge the reliability of Dr. Barry Ogin's opinions. *See generally* [Doc. 55]. Rather, it challenges the timeliness of the Seventh Supplemental Disclosure on January 8, 2024. *See* [*id.*]. Accordingly, Rule 26 and 37 of the Federal Rules of Civil Procedure apply, rather than Rule 702 of the Federal Rules of Evidence.

of the deadline to do so.  The Motions are thus ripe for review and the Court considers them below.

**DEFENDANT'S MOTION TO STRIKE**

## I.     Background

Pursuant to the Scheduling Order, [Doc. 31], Plaintiff's and Defendant's affirmative expert disclosures were originally due on June 6 and July 6, 2023, respectively, while the Parties' rebuttal expert disclosures were due on August 4, 2023, [*id.* at 8].  Thereafter, the Parties sought several extensions to various deadlines set forth in the Scheduling Order. *See, e.g.*, [Doc. 36; Doc. 39; Doc. 45; Doc. 47].  On August 29, 2023, the Judge Starnella reset, inter alia, Plaintiff's affirmative and rebuttal expert disclosure deadlines for September 18, 2023, and November 14, 2023, respectively.  [Doc. 47].  Judge Starnella also reset the Discovery Cut-Off for December 22, 2023, *see* [*id.*], and later extended that deadline through January 26, 2024, [Doc. 54].

On August 4, 2023, Mr. Ganison disclosed records and opinions from treating experts and retained expert Dr. Barry Ogin.  [Doc. 55 at 3; Doc. 58 at 2].  Plaintiff alleges that he sustained injuries to his right should, neck, and head in the Accident, and he retained Dr. Ogin to provide opinions on Plaintiff's injuries and the causation of his injuries. [Doc. 58 at 2].  In Dr. Ogin's report, he states that, while he did not receive medical records for "repeat facet injections at C5-6" in May 2021, Mr. Ganison reported receiving the procedure at that time.  [Doc. 55 at 3; Doc. 55-1 at 5, 9].  In the "Discussion" section of his report, Dr. Ogin states that

> Mr.   Ganison   underwent   bilateral   C5-6   facet   injections   on 5/20/2020. . . .  [H]e had an excellent therapeutic [and] . . . good clinical response to the injections.  Mr. Ganison reports that his neck pain recurred, and he underwent repeat facet injections in May 2021 (records not provided). . . .  [I]t appears that Mr. Ganison experienced a cervical strain

and an injury to his C5-6 facet joints, as a direct result of the motor vehicle accident of 10/18/19. . . .  Given that Mr. Ganison has now had two sets of intra-articular facet joint injections, and reports approximately one year or longer relief following each set, it would be reasonable to repeat the facet joint injections. . . .  I would therefore allow up to 3-5 additional facet joint injections at C5-6. . . .  [O]utside of repeat facet procedures, . . . I have no further recommendations for Mr. Ganison, as it relates to the motor vehicle accident of 10/19/2019.

[Doc. 55-1 at 8–9].

State Farm endorsed Dr. Annu Ramaswamy as a retained expert.   In Dr. Ramaswamy's report, he states that

in looking at the medical record, Mr. Ganison only underwent 1 set of cervical facet steroid injections (bilateral C5-C6) in May 2020.  Per his history, he states that the injections resolved his pain for 18 months. . . .  [O]ne would have expected recurrent symptomatology from a physiologic standpoint sooner than almost 18 months out from the initial injection.  It appears that the injections resolved the accident-related [injuries] based on medical record review and based on Mr. Ganison's history. . . .  I would opine that by May 2021 (1 year out from the initial facet injections), Mr. Ganison would have reached maximum therapeutic benefit. . . .  [N]o further treatment would be necessary (after May 2021).

[Doc. 55-2 at 48–49].

On November 14, 2023, Mr. Ganison disclosed Dr. Ogin's Medical Record Review Addendum, [Doc. 55-3], wherein Dr. Ogin (1) confirmed that he was not provided with medical records showing that Mr. Ganison received C5-6 injections in May 2021, and (2) concluded that "[i]f indeed Mr. Ganison did have a repeat injection in May 2021, as he asserts [sic] then I would consider future face blocks to be accident related," [*id.* at 3 (emphasis added)].

On January 8, 2024—two months after the rebuttal expert disclosure deadline and just weeks before discovery closed—Mr. Ganison served on State Farm a "Seventh Supplemental Disclosure" (or "Supplemental Disclosure").  The Supplemental Disclosure disclosed Mr. Ganison's medical records and bills from various medical providers for

dates of service of February 21, 2023; April 5, 2023 ("April 5 Record"); and October 19, 2023 ("October 19 Record"). [Doc. 55-4]. Dr. Michael Tracy prepared the April 5 Record, which contains a summary of other providers' records and a note that Mr. Ganison received C5/6 injections in May 2021. [Doc. 55-4 at 2]. The April 5 Record also recommends a "repeat bilateral C5/6 injection[]." [*Id.* at 1]. The October 19 Record reflects that the injections recommended by Dr. Tracy were subsequently performed. [*Id.* at 2–3]. According to State Farm, Mr. Ganison offered no explanation as to why the records contained in the Supplemental Disclosure were not previously disclosed. [Doc. 55 at 4]. Discovery closed on January 26, 2024. [Doc. 54].

State Farm now seeks to preclude any opinion by Dr. Ogin—or any expert proffered by Plaintiff—that was not contained in the timely disclosures of that expert's reports, including any opinion relating to future care needs, because "no opinion in that regard is supported by timely disclosure." [Doc. 55 at 7]. State Farm also seeks to preclude the Supplemental Disclosure as untimely. [*Id.* at 4].

## II. Legal Standards

### A. Rule 26

Rule 26(a)(2) of the Federal Rules of Civil Procedure provides that a party must disclose to all other parties the identity of any person who may be used at trial to present evidence under Rule 702, 703, or 705 of the Federal Rules of Evidence. Fed. R. Civ. P. 26(a)(2)(A). A retained expert must provide a report that contains (1) a complete statement of all opinions the witness will express and the basis and reasons for them; (2) the facts or data considered by the witness in forming them; (3) any exhibits that will be used to summarize or support them; (4) the witness's qualifications, including a list of all publications authored in the previous 10 years; and (5) a statement of the

compensation to be paid for the study and testimony in the case.  Fed. R. Civ. P. 26(a)(2)(B).  The Rule also dictates that parties shall disclose affirmative experts first, and disclose rebuttal witnesses within 30 days after the other party's disclosure, unless otherwise set by the court.  Fed. R. Civ. P. 26(a)(2)(D).

A party may supplement disclosures made pursuant to Rule 26(a), including expert reports, if the party discovers that the disclosure is "incomplete or incorrect" in some "material respect."  Fed. Rule Civ. P. 26(e)(1)(A).  Such supplementation must be "timely" made, but no later than the time a party's pretrial disclosures are due under Rule 26(a)(3).  Fed. R. Civ. P. 26(e)(1)(A), (e)(2).   Under this District's Local Rules of Civil Practice, disclosures under Rule 26(a)(3) of the Federal Rules of Civil Procedure must be made by the deadline for the submission of the Final Pretrial Order.  D.C.COLO.LCivR 26.1(b); *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, No. 10-cv-02516-WJM-KLM, 2015 WL 72360, at *3 (D. Colo. Jan. 5, 2015); *Buben v. City of Lone Tree*, No. 08-cv-00127-WYD-MEH, 2010 WL 4810632, at *2 (D. Colo. Nov. 19, 2010).

Nevertheless, simply because supplemental disclosures are made on or before a deadline does not necessarily mean that they are "timely" under Rule 26(e); the court will also consider a party's diligence in obtaining the supplemental information, the length of time to supplement once the party obtained the supplemental information, and other relevant facts to determine whether a party's course of conduct in supplementing frustrates the purpose of Rule 26 to promote full and orderly pretrial disclosure.  *See, e.g.*, *Jama v. City and Cnty. of Denver*, 304 F.R.D. 289, 299–300 (D. Colo. 2014) (discussing timeliness under Rule 26(e)); *Harvey v. United States*, No. 04-cv-00188-WYD-CBS, 2005 WL 3164236, at *13 (D. Colo. Nov. 28, 2005).

Rule 26(e)(1) permits—indeed requires—an expert to supplement his report and disclosures in certain circumstances.  Those circumstances are when the party or expert learns the information previously disclosed is incomplete or incorrect in some material respect.  *See* Fed. R. Civ. P. 26(e); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953–54 (10th Cir. 2002).  This provision is "not intended to provide an extension of the expert designation and report production deadline[s]" and may not be used for this purpose. *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 324 (5th Cir. 1998). Permissible supplementation under the Rules instead "means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure."  *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1169 (D. Colo. 2006) (quoting *Keener v. United States,* 181 F.R.D. 639, 640 (D. Mont. 1998)); *see also Beller v. United States*, 221 F.R.D. 689, 694–95 (D.N.M. 2003).  A party may also be ordered by the court to supplement or correct an expert's disclosure to include information thereafter acquired.  *See* Fed. R. Civ. P. 26(e)(1)(B).

"A plain reading of Fed. R. Civ. P. 26(e)(1) suggests that a supplemental expert report should be based upon additional or corrective information that was not available at the time of the expert's original report."  *SEC v. Nacchio*, No. 05-cv-00480-MSK-CBS, 2008 WL 4587240, at *3 n.3 (D. Colo. Oct. 15, 2008) (citing *Minebea Co. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005) (stating that Rule 26(e)(1) "permits supplemental reports only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report")); *see also Scholl v. Pateder,* No. 09-cv-02959-PAB-KLM, 2012 WL 2360542, *3 (D. Colo. June 20, 2012).

### B.    Rule 37

Rule 37(c) governs violations of Rule 26(a) and (e).  Fed. R. Civ. P. 37(c).  Rule 37(c)(1) of the Federal Rules of Civil Procedure provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A)  may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B)  may inform the jury of the party's failure; and
>
> (C)  may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(iv).

Fed. R. Civ. P. 37(c)(1).  The determination as to whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the court.  *Woodworker's Supply, Inc. v. Principal Mt. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).  In exercising this discretion, the court's consideration is guided by the following four factors:  (1) the prejudice or surprise to the impacted party; (2) the ability to cure the prejudice; (3) the potential for trial disruption; and (4) the erring party's bad faith or willfulness.  *Id.*

In seeking to avoid a preclusion sanction, the party responsible for a Rule 26(a) violation bears the burden of showing the failure was substantially justified or harmless.  *Sender v. Mann*, 225 F.R.D. 645, 655 (D. Colo. 2004); *see also Contour PAK, Inc. v. Expedice*, *Inc.*, No. 08-cv-01091-PAB-KMT, 2009 WL 2490138, at *1 (D. Colo. Aug. 14, 2009) ("The burden of establishing substantial justification and harmlessness is upon the party who is claimed to have failed to make the required disclosures.") (quotation omitted).

III.    **Analysis**

State Farm asserts that the Supplemental Disclosure "contain[s] information that should have been disclosed close in time to when the records were generated but at minimum prior to the rebuttal expert deadline of November 14, 2023."  [Doc. 55 at 5]. State Farm concedes that the October 19 Record "was not generated until October . . . 2023."  [*Id.* at 6].  However, given that the recommendation for the injections performed in October 2023 was provided to Mr. Ganison in the April 5 Record, State Farm argues that "had the February and April records been provided timely," Dr. Ramaswamy could have considered "at least those records" in his own report.  [*Id.*].  Because Mr. Ganison failed to provide State Farm with any "notice that an injection was going to be done in October [2023]," the Parties also never conferred regarding an extension of expert or discovery deadlines.  [*Id.*].  State Farm argues that the Supplemental Disclosure should be stricken from the record because there is no substantial justification for Mr. Ganison's failure to disclose these documents by the Court's deadline.  [*Id.* at 4–7].  In addition, State Farm contends that permitting the submission of such documents—after the expert disclosure deadlines and the close of discovery—would prejudice State Farm.  [*Id.* at 6–7].

In response, Mr. Ganison argues that the Motion to Strike is improper procedurally and, among other things, asserts that he does not intend to call Dr. Ogin to opine on the documents contained in the Seventh Supplemental Disclosure.  *See generally* [Doc. 58]. The Court addresses Mr. Ganison's argument that the Motion to Strike is procedurally improper before turning to the Parties' substantive arguments.

A.      **Procedural Considerations**

Mr. Ganison responds that the Motion to Strike "inappropriately raises timeliness of Rule 26 disclosures, an issue that does not bear on the merits of this Motion" and claims that "[i]t is inappropriate to force Plaintiff to answer for the alleged untimely disclosure" of the Supplemental Disclosure "in this forum." [*Id.* at 4–5]. According to Mr. Ganison, the "proper forum for these allegations is a separate process that allows for robust and relevant presentation of evidence, not a casual mention in a 702 Motion to Strike." [*Id.* at 5]. The Court respectfully disagrees.

First, the undersigned's Civil Practice Standards require "all challenges to an expert's testimony . . . be made in a single motion, even if the moving party seeks to strike the expert's testimony on multiple grounds (e.g., under Rule 702 and Rule 26(a)(2) of the Federal Rules of Civil Procedure)." NYW Civ. Practice Standard 7.1C(d). Second, Mr. Ganison neither requests an evidentiary hearing, as required by NYW Civ. Practice Standard 7.1C(b), nor identifies the "separate process" he deems more appropriate. Finally, the undersigned's Civil Practice Standards provide that "any motion to strike an expert on the basis of discovery violations shall be filed no later than thirty (30) days after the deadline for disclosure of rebuttal witnesses." NYW Civ. Practice Standard 7.1C(a). However, the Court is persuaded by Defendant's argument that it was impossible to do so here because the Seventh Supplemental Disclosure was not filed until January 8, 2024—55 days after the rebuttal disclosure deadline. In any event, Defendant filed its Motion to Strike on January 26, 2024, within 30 days of the late disclosure underlying the Motion to Strike.

Insofar as Mr. Ganison argues that the Motion to Strike is improper because the Seventh Supplemental Disclosure is not a supplemental expert disclosure and Dr. Ogin

will not opine on the information contained therein, the Court again disagrees.  Plaintiff implicitly suggests that, while he does not intend to elicit testimony from *Dr. Ogin* on this topic, he may elicit testimony on the late disclosed information from a different witness.  *See* [Doc. 58 at 4–5].  But as Defendant points out, allowing any specially-retained expert—Dr. Ogin or otherwise—to opine about the information contained in the Seventh Supplemental Disclosure would be prejudicial to Defendant because its expert was not afforded the same opportunity, and the deadlines for expert disclosures have long since passed.  [Doc. 65 at 3].  Moreover, no other opinion as to future care needs has been properly and timely disclosed by Plaintiff such that any other expert could opine on the Seventh Supplemental Disclosure.  [*Id.*].

Given the information contained in the Seventh Supplemental Disclosure and the circumstances surrounding the Parties' competing expert opinions, the Court finds Defendant's Motion to Strike an appropriate vehicle to challenge the late disclosed Seventh Supplemental Disclosure and any opinions based thereon.

## B.    Rule 26(a) Violation

Before considering whether the Supplemental Disclosure should be stricken, the Court must first determine whether there was a Rule 26(a) violation.  Mr. Ganison represents that Dr. Ogin will not provide any testimony about the documents identified by Seventh Supplemental Disclosure nor will he offer any opinions or any testimony from Dr. Ogin "regarding the need for future facet injections related to the subject collision."  [Doc. 58 at 4].  What is not clear is whether Mr. Ganison intends to elicit any testimony from Dr. Ogin based on information first disclosed in the Seventh Supplemental Disclosure or from experts other than Dr. Ogin about the need for future facet injections related to the subject collision.  Thus, the Court's analysis focuses on this precise issue.

As set forth above, Rule 26(a) requires that an expert report contain "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as "the data or other information considered by the witness in forming the opinions." Fed. R. Civ. P. 26(a)(2)(A).   Thus, a Rule 26(a) violation occurs upon the filing of supplemental expert documents if the additional documents contain information beyond what was disclosed in the original expert report.  *Galaxy Ventures, LLC v. Rosenblum*, No. 03-cv-01236-JCH-LFG, 2005 WL 5988690, at *4 (D.N.M. July 21, 2005).

Upon review of the Supplemental Disclosure, the Court finds that it contains new information not included in Dr. Ogin's report and not previously disclosed beyond the need for future facet injections.  For example, Mr. Ganison does not argue that this additional information was not available to him prior to issuing the Supplemental Disclosure, or that the new information is intended to correct Dr. Ogin's report, so as to fall into the exception set forth in Rule 26(e).  *See* Fed. R. Civ. P. 26(e) (providing that a party is under a duty to supplement "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing").  Nor does the record suggest that the additional information is newly discovered since the deadline and disclosure of Dr. Ogin's report.[3]

---

[3] However, the Court notes that Defendant had equal access to the February 2023 record identified in the Motion to Strike insofar as Plaintiff previously disclosed that provider and provided signed releases to Defendant for that medical provider.  *See* [Doc. 58 at 5 n.1 ("The February 2023 record Defendant refers to in their Motion was from Health Images Fort Collins, a provider who was disclosed in Plaintiff's Responses to Defendant's First Set of Written Discovery, filed on March 17, 2023.  Defendant had releases signed by Plaintiff and equal access to order this record.")].

Mr. Ganison neither argues nor establishes that this information was somehow not available to Mr. Ganison or Dr. Ogin at the time Dr. Ogin propounded his initial or rebuttal reports, or that this additional information seeks to correct the original report to bring it into the purview of Rule 26(e) for Dr. Ogin or any other expert.  With respect to the new information, the Court finds that it is not contained in any "*complete statement* of all opinions the witness will express and the basis and reasons for them," as required by Rule 26(a).  *See* Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added).  Thus, the submission of that additional information—after the expert disclosure deadlines—runs afoul of Rule 26(a).  *See* Fed. R. Civ. P. 26(a)(2)(D) (stating that expert disclosures "shall be made at the times and in the sequence that the court orders"); *see also Galaxy Ventures*, 2005 WL 5988690, at *4 (finding that supplemental expert report was untimely when it included new information).

**B.     Sanction for Rule 26(a) Violation**

Upon a finding of a Rule 26 violation, the Court must determine what sanctions, if any, are appropriate.   "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless."  Fed. R. Civ. P. 37(c)(1).  Courts consider the following factors in determining whether a violation of Rule 26(a) was justified or harmless:  "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness."  *Woodworker's*, 170 F.3d at 993.

The Court notes that, aside from a footnote in his Response, Mr. Ganison makes no argument as to the *Woodworker's* factors.  [Doc. 58 at 5 n.1 ("The timing of the 7th

Supplement is harmless, as no party is prejudiced, given Plaintiff's Expert, Dr. Ogin, will not be opining on it, Defendant's expert still has the opportunity to review the record, there is no potential for trial disruption as a trial date has not yet been set, and Plaintiff did not act in bad faith or willingly in not disclosing this record.")].   Similarly, while State Farm raises arguments as to prejudice and surprise, the remaining *Woodworker's* factors are left unaddressed.  [Doc. 55].

Given that the disclosure of such information occurred only after the close of discovery, the Court finds potential prejudice and surprise to State Farm.  The Court also finds this prejudice likely incurable insofar as the deadlines for expert disclosures, discovery, and dispositive motions have passed.  Thus, the Court concludes that Mr. Ganison has failed to meet his burden of demonstrating that his Rule 26(a) violations were either justified or harmless.  *See Contour PAK*, 2009 WL 2490138, at *1 (citing Rule 37(c)(1) and noting that the burden of establishing substantial justification and harmlessness is upon the party who is claimed to have failed to make the required disclosures); *Auraria Student Hous.*, 2015 WL 72360, at *4 (implicitly recognizing that the burden under the *Woodworker's* factors rests with the party who failed to make timely disclosures); *cf. Galaxy Ventures*, 2005 WL 5988690, at *5 ("To allow supplementation of reports with new opinions would thwart opposing counsel's ability to evaluate the strength and weakness of a case and to prepare to meet proofs at trial." (quotation omitted)).

As a result, I will **GRANT** the Motion to Strike insofar as Mr. Ganison seeks to rely upon the Supplemental Disclosure to define or support any <u>expert's</u> opinions at trial, and expressly limit Dr. Ogin to testifying as to the records he identified in his initial and rebuttal reports.  However, to the extent that Mr. Ganison seeks to elicit testimony from Dr. Tracy;

Dr. Cesar Garcia; Dr. Saidmunib Sana; or Dr. Tam Nguyen, *see* [Doc. 55-4], those individuals may be permitted to testify about their percipient knowledge of Mr. Ganison's treatment as reflected in the documents identified by the Seventh Supplemental Disclosure, subject to applicable rules of evidence.

### DEFENDANT'S MOTION TO EXCLUDE

State Farm seeks an order excluding several opinions set forth in the expert report of Plaintiff's retained expert on insurance industry standards, Mr. Rosenberg. Specifically, State Farm seeks to exclude Mr. Rosenberg's opinions (a) that State Farm could not try to negotiate a settlement without having all records, could not use a "non medically trained adjuster," and wrongly advised Mr. Ganison about the applicable limitation period; (b) regarding "post suit claim handling" and the "amount of MPC offset"; and (c) containing assertions either legal in nature or lacking foundation.  [Doc. 56 at 3–4 (citing [Doc. 56-2])].

## I.    Legal Standard

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "In essence, Rule 702 permits a court to admit expert testimony that is 'both reliable and relevant.'"  *Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1172

(10th Cir. 2020) (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006)).  The party proffering expert testimony has the burden of showing its admissibility by a preponderance of the evidence.  *Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1048 (D. Colo. 2011).

It is well established that trial courts are charged with the responsibility of acting as gatekeepers to ensure that expert testimony is reliable and relevant.  *See Kumho Tire Co.*, 526 U.S. at 147–52; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588–89 (1993).  To fulfill that gatekeeper function, the trial court first analyzes whether the proffered expert is qualified "by knowledge, skill, experience, training, or education" to render their opinions.  Fed. R. Evid. 702; *Bill Barrett Corp. v. YMC Royalty Co.*, 918 F.3d 760, 770 (10th Cir. 2019).  If the expert is so qualified, the trial court must determine whether the expert's opinions are reliable by assessing the underlying reasoning and methodology.  *Bill Barrett Corp.*, 918 F.3d at 770.  "Where an expert testifies based on experience, the tribunal reviews the reliability of the testimony with reference to 'the nature of the issue, the expert's particular expertise, and the subject of the testimony.'" *F & H Coatings, LLC v. Acosta*, 900 F.3d 1214, 1222 (10th Cir. 2018) (quoting *Kumho Tire Co.*, 526 U.S. at 148–50).  And finally, the court must determine whether the expert's opinions are "applicable to a particular set of facts," i.e., are relevant to the case at hand. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003).  This inquiry "encompasses Rule 702's requirement that the evidence help the trier of fact to understand the evidence or to determine a fact in issue."  *Sanderson*, 976 F.3d at 1172 (cleaned up).

## II.    Mr. Rosenberg's Report

Plaintiff disclosed Mr. Rosenberg to offer opinions regarding State Farm's handling of Plaintiff's uninsured motorist claim.  Since graduating from the University of Denver's

law school in 1996, Mr. Rosenberg has clerked for a judge on the Colorado Court of Appeals; prosecuted numerous bad faith cases against insurers; defended and consulted with various insurers who have been accused of bad faith; and litigated both first-party and third-party bad faith actions through trial and appeal.  He has also been endorsed as an insurance bad faith expert a number of times and has testified at trial in both state and federal court in cases where he has been disclosed as an expert.  His qualifications to express opinions in the areas of insurance bad faith have never been the subject of any successful challenge and are not challenged here.  *See* [Doc. 56-2 at 2].

His written report is 31 pages long and divided into several separate sections. From pages 2 through 15 of his report, Mr. Rosenberg recites the documents and facts he reviewed and relies upon for his opinion.  [*Id.* at 2–15].  This section includes a factual narrative of the Accident, injuries, and claim-handling at issue in this case, including a roughly chronological recitation of entries from State Farm's claim file.  [*Id.*].

Pages 15 through 21 of Mr. Rosenberg's report recite his understanding of the general "governing standards" for an insurance company's duty of good faith and fair dealing, including a discussion of standards developed through case law and statute.  [*Id.* at 15–21].  Pages 21 through 25 provide an overview of Mr. Rosenberg's understanding of general principles relating to uninsured and underinsured motorist insurance coverage, including the duty of the insurer to conduct a good-faith investigation of the accident that caused the insured's injury.  [*Id.* at 21–25].

Finally, pages 25 through 31 contain a summary of Mr. Rosenberg's opinions, including his overarching opinion that industry standards required State Farm to conduct a "reasonable and searching investigation into the salient facts," which should have

included, "at minimum, a thoughtful and unbiased review of the medical records and the opinions of Mr. Ganison's treating providers, consideration of liability aggravators," and "some analysis of the intrinsic biases and sympathies at issue in the particular case" and "how they might drive the size of a jury's award should the parties not be able to resolve the claims amicably without litigation." [*Id.* at 26]. Based on his review of the case, Mr. Rosenberg opines that that did not happen. [*Id.* at 25–26].

Relevant to Plaintiff's claim that he is entitled to additional UM coverage, Mr. Rosenberg concludes that State Farm was obligated to evaluate Mr. Ganison's claim against the hit-and-run tortfeasor and determine and pay all damages and losses which he would be legally entitled to collect from the tortfeasor under Colorado law, up to the Policy's limit for UM/UIM coverage ($100,000). [*Id.* at 25]. Mr. Rosenberg opines that State Farm and its adjusters "should have . . . consulted Colorado's pattern jury instructions" to "understand . . . Colorado personal injury law" because it "governs Mr. Ganison's legal entitlement to recover damages against the hit-and-run-driver." [*Id.*]. Based on his own assertions that State Farm's adjuster did not "appear" to: (a) be trained regarding Colorado's pattern jury instructions and "how they govern an injured party's ability to recover," (b) "understand that claims decisions should be based on probabilities and not possibilities," and (c) "understand the egg-shell plaintiff rule" under Colorado law, Mr. Rosenberg opines that State Farm's conduct is "certainly below industry standards." [*Id.* at 25 n.4].

"Before turning to the bulk of [his] criticisms of the claim-handling . . . reflected in [State Farm's] file," Mr. Rosenberg also takes issue with the fact that State Farm redacted its UM reserve and settlement authority from the claim file and "fail[ed] to produce any

evidence of its post-suit claim handling."  [*Id.* at 26].  Next, Mr. Rosenberg identifies 22 separate "significant complaints" he has with State Farm's claims handling in this case, *see* [*id.* at 28–30], which lead to his ultimate conclusion that State Farm's investigation and evaluation of Mr. Ganison's claim for UM/UIM benefits "falls far below industry standards and norms applicable to first-party insurance claims," [*id.* at 25].  Relevant here, he takes issue with State Farm:

- "(7) failing to thoroughly investigate Mr. Ganison's claim (*e.g.*, from what I can tell the entirety of State Farm's claim handling consisted of having its non-medically-trained adjuster, Kelly Rials, review portions of Mr. Ganison's treatment records and then speak with him in an effort to close his claim down for between $20,000 and $25,000 based on her uninformed, subjective review);"

- "(10) attempting to rush Mr. Ganison's claim to 'settlement' before it had conducted a thorough investigation of the claim;"

- "(12) failing to consult with any medical professionals prior to extending its 'offer of $20,745.15 on March 11, 2021 or its $25,000 'offer' several months later;"

- "(13) providing disparate (and lesser) treatment to Mr. Ganison from that which I have seen it provide when its policyholders are represented by counsel;"

- "(14) attempting to capitalize on Mr. Ganison's lack of sophistication with regard to the nuances and distinctions between UM and medical payments coverages;"

- "(15) improperly redacting reserve information and settlement authority from its claim file;"

- "(16) wrongly advising Mr. Ganison . . . that the statute of limitations on his UM claim was 4 years when it was, in fact, 3 years;" and

- "(18) discounting these same medical bills without a reasonable basis and in contravention of Colorado's collateral source rule."

[*Id.* at 29].  Mr. Rosenberg's final complaint, which is essentially his overarching opinion, is that "in general," State Farm conducted "what amounted to an incomplete, inadequate

and one-sided / biased [sic] investigation in which the insurer looked for and gave greater weight to evidence it claimed supported nonpayment . . . than it gave to evidence supporting payment . . . ."  [*Id.* at 29–30].

Mr. Rosenberg also opines that State Farm violated several statutory rules, including provisions of the Colorado and Wyoming Unfair Claims Settlement Practices Acts, Colo. Rev. Stat. § 10-3-1104(1)(h), Wyo. Stat. Ann. § 26-13-124 ("UCSPA"), by, among other things, compelling Mr. Ganison to "institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds" and "[f]ailing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."  [*Id.* at 30 (quotations omitted)].

## III.   Analysis

State Farm argues that certain of Mr. Rosenberg's opinions and anticipated expert testimony should be excluded under Rule 702 because certain of his opinions are one or more of the following:  (1) not based on a reliable application of sound principles to the facts of this case; (2) not relevant; (3) impermissibly speculative; and/or (4) impermissible legal conclusions.  *See generally* [Doc. 56].  Before turning to State Farm's arguments, I note my agreement with other courts in this District that using a 702 challenge to attack an expert's report on a line-by-line basis is generally not effective:

> [T]he Court pauses to observe that a line-by-line exegesis of the opposing expert's report is not a particularly effective method for bringing a Rule 702 challenge.  Most expert reports are simply disclosure tools, not the script by which an expert will testify at trial.  Not every statement made in an expert's report will be uttered at trial, and frequently they contain offhand remarks, asides, explanations of methodology, facts that the expert has derived from

other sources or simply assumed, and even arguments, little of which may actually be offered for admission at trial.

*Clifton v. State Farm Mut. Auto. Ins. Co.*, No. 18-cv-01231-MSK-STV, 2021 WL 1100403, at *2 (D. Colo. Mar. 23, 2021); *see also Tucker v. Allstate Prop. & Cas. Ins. Co.*, No. 19-cv-03693-NRN, 2021 WL 2805450, at *5 (D. Colo. July 6, 2021).  As Judge Krieger noted in *Clifton*, it is essential for a party challenging a potential expert's testimony under Rule 702 "to vigorously sift an expert's report to separate the wheat—the expert's actual opinions—from the remaining chaff."   *Clifton*, 2021 WL 1100403, at *2.   Indeed, "objections that do not invoke the relatively narrow grounds of Rule 702 invariably result in denial of a motion with leave to raise non-Rule 702 objections at an appropriate time before or during trial." *Id*.

With this in mind, I turn to address State Farm's arguments as to reliability, relevance, foundation, and legal conclusions, in turn.

### A.      Reliability

As to the specifics of Mr. Rosenberg's opinions and the underlying basis for those opinions, I find that for purposes of Rule 702 admissibility, Mr. Rosenberg has sufficiently articulated the factual bases for his opinions.

***Specific Industry Standards.***  State Farm argues that some of Mr. Rosenberg's opinions do not rely upon any reliable industry standards and highlights several opinions that it contends are simply Mr. Rosenberg's *ipse dixit*.  *See* [Doc. 56 at 6–7].   "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Mooring Cap. Fund, LLC v. Phoenix Cent., Inc.*, No. 5:06-cv-00006-HE, 2009 WL 4263359, at *5 (W.D. Okla. Feb. 12, 2009)

("[A]n expert's opinions are not admissible merely because the expert says, in effect, 'trust me, I know.'").  The Court respectfully disagrees that Mr. Rosenberg's opinions are unsupported *ipse dixit* statements.

First, the Court agrees with Plaintiff insofar as he argues that State Farm's "attempt to separate each of the 22 issues raised by Mr. Rosenberg as separate opinions, which each require their own supporting evidence of an industry standard, is misplaced."  *See* [Doc. 59 at 9]; *see also Tucker*, 2021 WL 2805450, at *7.  Rather than being viewed as separate opinions, Mr. Rosenberg's list of 22 "significant complaints" about State Farm's conduct should be viewed as the foundation for his overarching opinion that State Farm failed to adequately and fairly investigate and evaluate Mr. Ganison's claim.

With this scope in mind, I find that Mr. Rosenberg's report does identify certain industry standards on which Mr. Rosenberg's ultimate opinion of bad faith is based, including standards developed through case law and statute.  *See* [Doc. 56-2 at 15–25].  Mr. Rosenberg's general opinion is the following:

> The ultimate determination of claim value should have occurred following and as part of a reasonable and searching investigation into the salient facts, including, at minimum, a thoughtful and unbiased review of the medical records and the opinions of Mr. Ganison's treating providers, consideration of liability aggravators (e.g., hit-and-run collision on a highway resulting in forceful front and rear impacts and substantial property damage)[,] some analysis of the intrinsic biases and sympathies at issue in the particular case (51-year-old sanitation worker forced to endure extensive treatment through no fault of his own) and how they might drive the size of a jury's award should the parties not be able to resolve the claims amicably without litigation.  From a review of the records in this case, State Farm'[s] investigation and evaluation appear woefully deficient, and contrary to industry standards for handling similar claims.

[*Id.* at 26].  Mr. Rosenberg's articulation of an overarching standard, and specific examples of how State Farm allegedly violated that standard, is consistent with the type of expert testimony that has been admitted in this type of case.  *See, e.g.*, *Tucker*, 2021

WL 2805450, at *7 (denying insurer's motion to exclude Mr. Rosenberg's expert opinions in bad faith case involving first-party UM claim); *Peiffer v. State Farm Mut. Auto. Ins. Co.*, 940 P.2d 967, 971 (Colo. App. 1996) (affirming admittance of insurance expert's testimony in bad faith case where expert opined that insurer had violated several provisions of the UCSPA when it denied the plaintiff's claim and testimony related to the facts of the insurer's conduct in light of the provisions of the UCSPA and applicable insurance industry standards); *see also O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 927 (D. Colo. 2017). The Court finds that Mr. Rosenberg's opinions are not improper *ipse dixit* statements.

**Issues of Correctness.** Although State Farm frames its arguments as attacking the reliability of Mr. Rosenberg's opinions, in reality, several of State Farm's arguments go toward the correctness of Mr. Rosenberg's opinions, the choices he made in selecting data to rely upon, and the results of his analysis. For example, State Farm summarizes its challenges to Mr. Rosenberg's opinions that State Farm:

> could not try to negotiate a settlement without having all records (there is no such industry standard); . . . could not use a "non medically trained adjuster" (there is no such industry standard); wrongly advised Mr. Ganison about the applicable limitation period (State Farm's statement was accurate) . . . .

[Doc. 56 at 3–4 (emphasis omitted)]. Elsewhere, State Farm argues that certain opinions are "inaccurate," [*id.* at 8–9], while others "ignore[]" various facts, [*id.* at 5].

However, the Court's task in ruling on the admissibility of Mr. Rosenberg's opinions is to determine whether the opinions are reliable, not whether they are correct. *Cook*, 580 F. Supp. 2d at 1084–85. "Maintaining this distinction between the evidentiary requirement of reliability and the higher standard of whether the expert's conclusions are correct or sufficient to prove the merits is indeed significant as it preserves the

fact[-]finding role of the jury."  *Id.* (quotation omitted); *see also Daubert*, 509 U.S. at 596 (indicating that expert testimony evidence can be "shaky" and still admissible, and stating that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" such evidence).  Thus, the Court's inquiry cannot constitute a value judgment as to the correctness of a witness's opinion.  *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005) ("[A] trial court's focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions.").

State Farm's arguments as to correctness bear principally on the weight or credibility of Mr. Rosenberg's opinions but do not prevent him from testifying.  *See* Fed. R. Evid. 702.  To the extent that State Farm has identified what it believes are flaws in Mr. Rosenberg's methodology or analysis, State Farm may raise those issues on cross-examination.  *See Cook*, 580 F. Supp. 2d at 1134 (arguments concerning the data relied upon by the expert go to the weight of the expert's opinions, not their admissibility).  The Court therefore applies the usual rule that "the rejection of expert testimony is the exception rather than the rule," Fed. R. Evid. 702, advisory committee's note to 2000 amendment, and that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

The Court finds that, despite State Farm's arguments to the contrary, Mr. Rosenberg's opinions are sufficiently reliable to meet the Rule 702 threshold.

B.      Relevance

State Farm also seeks to exclude, as not relevant, Mr. Rosenberg's opinion that State Farm acted improperly by redacting reserve information and settlement authority from its claim file.  [Doc. 56 at 7].  State Farm asserts that these positions are irrelevant because Plaintiff's operative Complaint does not include allegations concerning State Farm's post-suit conduct.  [*Id.*].  Plaintiff responds that he is "not required to outline every issue of the case in their [sic] operative Complaint," and claims that the issue—which was "discovered after the Complaint arose"—is nevertheless "covered within the scope" of the Amended Complaint because the issue "is tied to Plaintiff's claim of bad faith."  [Doc. 59 at 9].

The Court is not persuaded that State Farm's post-litigation conduct is "irrelevant" such that it should be excluded—particularly given that *State Farm* relies on its post-litigation conduct to support its Motion for Summary Judgment.  *See* [Doc. 57 at ¶ 16 (stating as an undisputed fact in support of summary judgment in its favor that "[on] January 29, 2024, State Farm indicated to Plaintiff it had evaluated all the evidence available" and listing the evaluation)].  Moreover, as the Tenth Circuit explained:

> In cases dealing with the common-law duty of good faith and fair dealing, Colorado courts have held that the "duty of good faith and fair dealing continues unabated during the life of an insurer-insured relationship, including through a lawsuit or arbitration between the insured and the insurer, although the adversarial nature of such proceedings *may* suspend the insurer's obligation to negotiate as a reflection of good faith." *Sanderson v. Am. Fam. Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010) (emphasis added); *see also Bucholtz v. Safeco Ins. Co.*, 773 P.2d 590, 592–93 (Colo. App. 1988); *Bankr. Est. of Morris v. COPIC Ins. Co.*, 192 P.3d 519, 523–24 (Colo. App. 2008).
>
> No Colorado court has applied this principle—that the initiation of a lawsuit may "suspend" an insurer's duty to make prompt payments—to unreasonable delay claims under § 10-3-1115.  And no Colorado court has ever held that an unreasonable delay claim—whether statutory or common

law—encompasses only damages arising before the insured files suit.  To the contrary, the Colorado courts of appeals have repeatedly emphasized that "bad faith breach of an insurance contract encompasses all of the dealings between the parties, including conduct occurring before, during, and after trial." *Bankr. Est. of Morris*, 192 P.3d at 524; *see also Parsons ex rel. Parsons v. Allstate Ins. Co.*, 165 P.3d 809, 815 (Colo. App. 2006).  In fact, the Colorado Supreme Court cited with approval a court of appeals case holding that "<u>evidence of bad faith conduct which occurred after the filing of the complaint was admissible</u>" because the evidence indicated "<u>a continuation of the same difficulties that preceded the filing of the complaint.</u>" *Dale v. Guaranty Nat. Ins. Co.*, 948 P.2d 545, 552 (Colo. 1997) (quoting *Southerland v. Argonaut Ins. Co.*, 794 P.2d 1102, 1106 (Colo. Ct. App. 1990)); *see also id.* ("[T]he tort of bad faith breach of insurance contract encompasses an entire course of conduct.").

*US Gen., LLC v. GuideOne Mut. Ins. Co.*, No. 22-1145, 2022 WL 17576353, at *4 (10th Cir. Dec. 12, 2022) (emphasis added).  Here, Mr. Rosenberg specifically "conclude[s] that State Farm's bad faith failings," including its post-litigation conduct, "represent a continuing pattern of conduct warranting redress."  [Doc. 56-2 at 28].  Thus, the Court finds that this evidence is relevant to Mr. Ganison's bad faith claims and **DENIES** the Motion to Exclude on this issue.

### C.   Speculative Opinions

Next, the Court agrees with State Farm's contention that certain of Mr. Rosenberg's opinions are improperly speculative.  Specifically, State Farm takes issue with Mr. Rosenberg's conclusions that it "provid[ed] disparate (and lesser) treatment to Mr. Ganison" than it provides "when its policyholders are represented by counsel" and "attempt[ed] to capitalize on Mr. Ganison's lack of sophistication" because they lack any evidentiary or factual support.  [Doc. 56 at 10 (quoting [Doc. 56-2 at 29] (alterations in original))].

Mr. Rosenberg's speculative opinions surmising what may have motivated State Farm's decisions—or how State Farm's actions departed from Mr. Rosenberg's

undisclosed and unspecified observations of State Farm's treatment of policyholders represented by counsel—will be excluded. *See O'Sullivan*, 233 F. Supp. 3d at 927. The Court finds Plaintiff's counterargument, that "Mr. Rosenberg's opinion that State Farm provided disparate treatment to Mr. Ganison . . . is based on his experience in the industry," [Doc. 59 at 12], belied by the contents of the expert's report. Mr. Rosenberg does not compare the facts of Mr. Ganison's claim to insurers' treatment of represented policyholders industrywide; instead, he compares State Farm's actions in this case to a vague State Farm-centric benchmark. Yet, Mr. Rosenberg does not identify any previous experience with State Farm, specifically, in his report. Moreover, nothing in the record reflects that Mr. Rosenberg has knowledge of the motivations or basis of State Farm's actions other than as revealed in the claims file and other factual materials he reviewed *for this case*.

The Court will therefore exclude speculative or subjective opinions or commentary, including statements lacking foundation as to what State Farm was "attempting" to do, [Doc. 56-2 at 29], or other testimony not grounded in a specific factual observation. *See* Fed. R. Evid. 602 (witness must have personal knowledge of the matter); Fed. R. Evid. 703 (testifying expert must have "been made aware of or personally observed" facts or data on which she or he relies). Accordingly, the Court **GRANTS** the Motion to Exclude with respect to this issue.

### D.      Legal Opinions

Finally, State Farm argues that Mr. Rosenberg's opinions should be excluded because such opinions would interfere with the Court's ability to instruct the jury on the applicable law and usurp the jury's fact-finding function. [Doc. 56 at 10–11]. The Court addresses these arguments together.

According to State Farm, Mr. Rosenberg's opinions improperly embrace the ultimate legal questions in this case on whether State Farm acted unreasonably or in bad faith in handling Mr. Ganison's claims and should therefore be excluded.  [*Id.* at 10].  State Farm also asserts that Mr. Rosenberg's opinions commandeer the jury's fact-finding function by "apply[ing] facts to law."  [*Id.* at 10–11].  Plaintiff responds that State Farm can raise objections at trial if Mr. Rosenberg's testimony appears to be crossing the line laid out in *King v. Allstate Insurance Co.*.  *See* [Doc. 59 at 13]; *see also King v. Allstate Ins. Co.*, No. 11-cv-00103-WJM-BNB, 2013 WL 3943607, at *5 (D. Colo. July 31, 2013) ("However, the Court sees a difference between, on the one hand, [the expert] testifying about the holding in a particular case and applying the rule of that case to the facts at issue here and, on the other hand, [the expert] testifying about his understanding of the law and how it impacts his understanding of the standards that govern the insurance industry.  The Court will permit testimony which resembles the latter; the former is impermissible.").  The Court finds the dichotomy set forth in *King* appropriate and applicable to this case and considers it within the contours of Mr. Rosenberg's report.

Insofar as State Farm seeks to exclude Mr. Rosenberg's opinion that its "investigation and evaluation of Mr. Ganison's claims for UM benefits . . . fall[] far below industry standards and norms applicable to first-party insurance claims," [Doc. 56 at 10 (quoting [Doc. 56-2 at 25])], that request is denied.  Consistent with numerous decisions of this Court and other courts in this District, Mr. Rosenberg may testify as to insurance industry standards, and he may testify that State Farm failed to comply with those standards.  *See, e.g.*, *Stoker v. State Farm Mut. Auto. Ins. Co.*, No. 19-cv-03569-NYW, 2021 WL 4201583, at *14 (D. Colo. May 6, 2021); *TBL Collectibles, Inc. v. Owners Ins.*

*Co.*, 285 F. Supp. 3d 1170, 1184 (D. Colo. 2018) (citing *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988)).

Mr. Rosenberg cannot, however, opine as to legal standards or whether State Farm violated Colo. Rev. Stat. § 10-3-1104, Wyo. Stat. Ann. § 26-14-124, or any other law, as he attempts to do in his expert report.  *See, e.g.*, [Doc. 56-2 at 30 ("State Farm has violated several statutory rules, including provisions of the Colorado and Wyoming Unfair Claims Settlement Practices Acts." (citing Colo. Rev. Stat. § 10-3-1104(1)(h) and Wyo. Stat. Ann. § 26-13-124))].   Nor may he direct the jury's understanding of the applicable legal rights and obligations of the parties, i.e., "define the legal parameters within which the jury must exercise its fact-finding function."  *See TBL Collectibles, Inc.*, 285 F. Supp. 3d at 1184 (quoting *Specht*, 853 F.2d at 809).  To do so would be to usurp the role of the trial court.  *Specht*, 853 F.2d at 810.

Put another way, Mr. Rosenberg is "permitted to testify generally about his understanding of the law and how it impacts his understanding of the standards that govern the insurance industry," but not about holdings of cases or how such holdings apply to this case.  *See Lua v. QBE Ins. Corp.*, No. 18-cv-01233-KLM, 2019 WL 5104477, at *5 (D. Colo. Oct. 11, 2019).  He also may not "state legal conclusions drawn by applying the law to the facts," *A.E. ex rel. Evans v. Indep. Sch. Dist. No. 25*, 936 F.2d 472, 476 (10th Cir. 1991), as "such ultimate conclusions would not be helpful to the jury and would improperly intrude on its fact-finding function," *O'Sullivan*, 233 F. Supp. 3d at 929.

Thus, the Court will not exclude Mr. Rosenberg's opinions insofar as he offers testimony regarding insurance industry standards and whether he believes State Farm complied with those standards.  However, Mr. Rosenberg will not be permitted to testify

as to any ultimate issues in this case, including State Farm's level of culpability in handling Mr. Ganison's claim. *See, e.g.*, [Doc. 56-2 at 25 (Mr. Rosenberg opining that "State Farm's conduct satisfies the more rigorous standard applicable to common law bad faith claims" and "[m]ost certainly . . . satisfies the lesser 'reasonableness' standard set forth in the Colorado statutes")]. Nor will he be permitted to opine as to the applicable law, as opposed to industry standards. *See TBL Collectibles, Inc.*, 285 F. Supp. 3d at 1184.

Finally, as did *King* and other courts in this District, this Court will give a limiting instruction prior to Mr. Rosenberg's testimony at trial. Such instruction will make clear that the Court will instruct the jury on the law and, to the extent that Mr. Rosenberg's testimony differs from the Court's instructions, the jury must credit the Court's instructions over such testimony. The instruction will also inform the jurors that they may give Mr. Rosenberg's testimony whatever weight they deem appropriate, and that they are the ultimate finders of fact in this case. The Parties should work together to attempt to stipulate to a proposed limiting instruction and should include such stipulated instruction in their set of proposed jury instructions. To the extent that the Parties are not able to reach a stipulation, the Court will accept competing proposed limiting instructions and make an appropriate ruling. *See King*, 2013 WL 3943607, at *5.

**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

State Farm moves for summary judgment on Mr. Ganison's first two claims: unreasonable delay or denial of insurance benefits under Colo. Rev. Stat. §§ 10-3-1115 and 10-3-1116, also referred to as "statutory bad faith" ("Claim One"); and bad faith breach of an insurance contract, often referred to as "common law bad faith" ("Claim

Two").  *See generally* [Doc. 57]; *see also Dowgiallo v. Allstate Ins. Co.*, No. 19-cv-03035-KMT, 2020 WL 1890668, at *2 (D. Colo. Apr. 16, 2020).

**I.     Undisputed Material Facts**

The following facts are drawn from the Parties' briefing and the record before the Court and are undisputed unless otherwise noted.

1.     Plaintiff alleges that, on or about October 18, 2019, he was injured in a car accident (the "Accident").  [Doc. 57 at ¶ 1; Doc. 63 at 2 ¶ 1; Doc. 34 at ¶ 5].

2.     At the time of the Accident, Plaintiff was a Wyoming resident.  [Doc. 57 at ¶ 2; Doc. 63 at 2 ¶ 2; Doc. 34 at ¶ 1].

3.     The Accident occurred in Denver, Colorado.  [Doc. 63 at 3 ¶ 1; Doc. 34 at ¶ 5].[4]

4.     Mr. Ganison's insurance Policy is a Wyoming policy.  [Doc. 57 at ¶ 4; Doc. 63 at 2 ¶ 4; Doc. 56-1 at 5].

5.     Under the Policy, Mr. Ganison had $100,000 in UIM coverage and $50,000 in MPC coverage.  [Doc. 63 at 3 ¶ 2; Doc. 34 at ¶ 14].

6.     The Policy included, under the UIM section, a "Nonduplication" provision, indicating State Farm would not pay under UIM coverage any damages already paid to or for Mr. Ganison "as expenses under Medical Payments Coverage of this policy" and

---

[4] State Farm did not file a reply brief in support of its Motion for Summary Judgment and thus did not respond to or contest any of the assertions in Mr. Ganison's Statement of Undisputed Material Facts.  *See* [Doc. 63 at 3].  Accordingly, those assertions, to the extent they are supported by record evidence, are deemed undisputed for purposes of this Memorandum Opinion and Order.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

that State Farm would not pay any amount which would "duplicate payments" Mr. Ganison "received or will receive for the same elements of loss" or cause Mr. Ganison "to recover more than the damages sustained."  [Doc. 57 at ¶ 5; Doc. 63 at 2 ¶ 5; Doc. 56-1 at 18].

7.      The Policy included a "Choice of Law" provision indicating that "[w]ithout regard to choice of law rules, the law of the state of . . . Wyoming will control . . . in the event of any disagreement as to the interpretation and application of any provision in this policy."  [Doc. 57 at ¶ 6; Doc. 63 at 2 ¶ 6; Doc. 56-1 at 36].[5]

8.      On March 8, 2021, State Farm noted Plaintiff's treatment for "[l]ow back pain" was due to a "work issue that is being handled [through] w/c.  No allegation of injury to low back here other than increased pain.  No [treatment] being sought due to low back for this loss."  [Doc. 57 at ¶ 9; Doc. 63 at 2 ¶ 9; Doc. 56-2 at 8].[6]

9.      On April 15, 2021, State Farm offered Mr. Ganison $25,000.00 to settle his disputed UIM claim, noting it was "not asking for release" and that the offer was "based on what we have now."  [Doc. 57 at ¶ 10; Doc. 63 at 2 ¶ 10; Doc. 56-2 at 8].[7]

---

[5] The Parties quote the Policy's choice of law provision in varying lengths in their respective statements of undisputed fact, although Plaintiff misquotes the actual language of the provision and fails to cite to his source. *Compare* [Doc. 57 at ¶ 6], *with* [Doc. 63 at 2 ¶ 6], *and* [Doc. 56-1 at 36].

[6] Plaintiff does not dispute the content of the claim note, but states, without citing to the record, that he "does believe his back pain increased following the subject incident."  [Doc. 63 at 2 ¶ 9].  There is no apparent conflict between the Parties' statements on this issue. Thus, the Court considers this fact undisputed.

[7] In response to paragraphs 10 through 12 of Defendant's Statement of Undisputed Facts, Plaintiff does not dispute that "this is what the claim note states" and asserts that the "evidence speaks for itself."  [Doc. 63 at 2–3 ¶¶ 10–12].  Plaintiff does not identify what aspect of paragraphs 10 through 12 he disputes, if any.

10.     On June 2, 2021, Mr. Ganison claimed "his low back was exacerbated, along with his new neck pain, to the point he is going to have to retire," among other new claims.  [Doc. 57 at ¶ 11; Doc. 63 at 3 ¶ 11; Doc. 56-2 at 9].

11.     State Farm explained it would "need all these records" and records "for 5 years prior to this loss."  [Doc. 57 at ¶ 12; Doc. 63 at 3 ¶ 12; Doc. 56-2 at 9].

12.     Two days later, Mr. Ganison advised that he would "accept 25k," and State Farm "confirmed [it] would not be asking for release so if anything else he would like us to review comes up, we cert[ai]nly will.  We discussed this 25K resolves his claim with all info to present."  [Doc. 57 at ¶ 13; Doc. 63 at 3 ¶ 13; Doc. 56-2 at 9].[8]

13.     On September 23, 2022, State Farm informed Plaintiff that he had three years of medical payment coverage under the Policy.  [Doc. 63 at 3 ¶ 3; Doc. 63-1 at 13].[9]

14.     On August 4, 2023, Plaintiff timely disclosed records and opinions from treating experts and retained expert Dr. Barry Ogin.  [Doc. 57 at ¶ 14; Doc. 63 at 3 ¶ 14; Doc. 55-1 at 5, 8–9; Doc. 55-2 at 48–49; Doc. 55-3 at 3].

15.     In his report, Dr. Ogin based his opinion that Mr. Ganison needed more treatment on his misunderstanding of when Mr. Ganison's last cervical care was.  It was May 2020, rather than May 2021, and this became clear in light of Dr. Ramaswamy's

---

[8] State Farm contends that Mr. Ganison accepted the $25,000 instead of providing additional records requested by State Farm.  [Doc. 57 at ¶ 13].  Plaintiff disputes this fact because the claim note on which State Farm relies "does not state that Plaintiff chose to do that rather than providing the records."  [Doc. 63 at 3 ¶ 13].

[9] Plaintiff asserts that this September 23, 2022 letter was "[t]he first time" State Farm informed him of the Policy's three-year limit for medical payment coverage.  [Doc. 63 at 3 ¶ 3; Doc. 63-1 at 13].  State Farm did not file a reply in support of its Motion for Summary Judgment.  However, in its Reply to the Motion to Exclude, State Farm cites to a "similar letter" sent to Mr. Ganison on October 23, 2019, explaining that his policy "provides Medical Payments Coverage for reasonable expenses" and such expenses "may be covered if incurred within three years."  [Doc. 64 at 2 n.1 (citing [Doc. 64-1])].

response and Dr. Ogin's rebuttal reports.  [Doc. 57 at ¶ 14; Doc. 63 at 3 ¶ 14; Doc. 55-1 at 5, 8–9; Doc. 55-2 at 48–49; Doc. 55-3 at 3].

16.     Plaintiff's Seventh Supplemental Disclosure indicates that his caregivers and all fact witnesses whose addresses are disclosed are located in Wyoming.  [Doc. 57 at ¶ 15; Doc. 63 at 3 ¶ 15; Doc. 57-2 at 1–5].

17.     On January 29, 2024, State Farm sent a letter to Plaintiff indicating that it had evaluated all the evidence available, including the reports of Drs. Ogin and Ramaswamy, and its evaluation was as follows:

Special Damages (medical bills considered/economic damages):  $24,698.94
Past Wage Loss:  $1,863.85
General Damages/Non-Economic Damages (pain and suffering, inconvenience, physical impairment and disfigurement, and loss of consortium):  $13,500.00

Subtotal:  $40,062.79
Medical Payments Coverage offset:  -$17,927.66

Total:  $22,135.13

[Doc. 57 at ¶ 16; Doc. 63 at 3 ¶ 16; Doc. 57-3 at 1].[10]

## II.    Choice of Law

State Farm asserts that Wyoming law governs the interpretation of the Policy and the claims in this action, whereas Plaintiff asserts that Colorado applies.  [Doc. 57 at 7–9; Doc. 63 at 4–5].  Accordingly, before turning to the merits of the Parties' summary judgment arguments, the Court must first engage in a conflict-of-law analysis to determine whether Colorado or Wyoming law applies.

---

[10] Plaintiff disputes receipt of this letter but does not otherwise dispute the contents of the letter.  [Doc. 63 at 3 ¶ 16].

### A.      Legal Standard

When exercising diversity jurisdiction, a court applies the choice of law rules of the state in which it sits.  *See, e.g.*, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Choice of law determinations are made on a "claim-by-claim" basis.  *Flaherty v. Banner Life Ins. Co.*, No. 20-cv-00581-REB-GPG, 2022 WL 1198909, at *1 (D. Colo. Feb. 7, 2022).  Courts do not make choice of law decisions unless an "outcome-determinative conflict" exists between two bodies of law that may apply to a claim.  *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 946 F. Supp. 861, 866 (D. Colo. 1996).  When no outcome-determinative conflict exists, a court applies the forum state's law.  *SELCO Cmty. Credit Union v. Noodles & Co.*, 267 F. Supp. 3d 1288, 1292 (D. Colo. 2017).  Thus, unless there is an outcome-determinative conflict between Colorado law and Wyoming law, Colorado law will apply to Plaintiff's claims in this action.

### B.      Analysis

As a threshold matter, the Court must determine whether Colorado or Wyoming law governs the claims asserted in this action.  Colorado law applies unless an outcome-determinative conflict exists between Colorado and Wyoming law, such that a choice-of-law analysis is required.

Here, an outcome-determinative conflict exists in at least three ways.  First, as Defendant argues in its Motion to Exclude, [Doc. 56 at 8–9], Colorado bars the setoff of medical payments coverage from UIM coverage, *see* Colo. Rev. Stat. § 10-4-609(1)(c), whereas Wyoming does not, *see generally* Wyo. Stat. Ann. §§ 31-10-101 through 104 (UIM coverage).  Thus, if Wyoming law applies, Mr. Ganison's recovery for breach of contract, if any, may account for the $17,927.66 that State Farm has already paid for MPC benefits; whereas if Colorado law applies, the MPC payments are not a permissible offset.

Second, Mr. Ganison's claim for unreasonable delay/denial is based on a Colorado statute that has no Wyoming analog.  Wyoming's Unfair Trade Practices Act, Wyo. Stat. Ann. §§ 26-13-101 to 26-13-125, does not explicitly create or deny a private right of action for an insurer's violation of the Act, and Wyoming courts have held that no private right of action exists under Wyo. Stat. Ann. § 26-13-124 (unfair claims settling practices) or any other provision of Wyoming's Insurance Code.  *See, e.g.*, *Herrig v. Herrig*, 844 P.2d 487, 494 (Wyo. 1992).  Thus, if Wyoming law establishes State Farm's duties, the statutory unreasonable delay/denial claim disappears.

Third, Wyoming recognizes two types of common-law bad faith in the insurance context—substantive bad faith and procedural bad faith—and different standards apply depending on the nature of the bad faith claim, whereas Colorado analyzes insurer bad faith under one standard similar to Wyoming's substantive bad faith. *Compare Bergantino v. State Farm Mut. Auto. Ins. Co.*, 500 P.3d 249, 252 (Wyo. 2021) (recognizing distinct frameworks for substantive and procedural theories of bad faith claim and noting that failure to establish one does not necessarily preclude the other), *with Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1275 (Colo. 1985) (elements of common law bad faith claim under Colorado law).  The difference between the frameworks for, and required elements of, a common law bad faith claim in Wyoming and Colorado could easily be outcome determinative.  *Cf. Daniluk v. Norfolk S. Ry. Co.*, No. 13-cv-01304-CMA-CBS, 2015 WL 148560, at *3 (D. Colo. Jan. 12, 2015) (finding no outcome-determinative conflict of law where required elements of claims under Colorado and Pennsylvania were "substantially the same"); *Xcel Energy Servs., Inc. v. Nat'l Am. Ins. Co.*, No. 22-cv-02802-CNS-STV, 2023 WL 3764640, at *1 (D. Colo. June 1, 2023) (finding no outcome-determinative

conflict where the frameworks for breach of contract claims under Colorado and Oklahoma law were "substantially the same").

For all these reasons, the Court finds that it must engage in a choice-of-law analysis. "As this court is sitting in diversity, . . . Colorado choice of law principles must be applied in the present case." *Power Motive Corp. v. Mannesmann Demag Corp.*, 617 F. Supp. 1048, 1049 (D. Colo. 1985). With these principles in mind, I consider Plaintiff's breach of contract, statutory bad faith, and common law bad faith claims, in turn.

### 1.    Breach of Contract

The Court's analysis begins by applying Colorado's contract conflict-of-laws principles, which includes consideration of the applicability of any choice-of-law provision within the Policy. *Kipling v. State Farm Mut. Auto. Ins. Co.*, 159 F. Supp. 3d 1254, 1265–66 (D. Colo. 2016). The Restatement (Second) of Conflict of Laws ("the Restatement (Second)") § 187(2) provides, in pertinent part:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless . . .
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*See King v. PA Consulting Grp., Inc.*, 485 F.3d 577, 585 (10th Cir. 2007) (quotation omitted). The application of section 187 necessarily requires the Court to consider what state has the most significant relationship to the contractual transaction and the Parties.

Colorado has adopted the choice of law principles set forth in the Restatement (Second) and applies the law of the state having "the most significant relationship" to the

particular issue in dispute.  *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau*, 601 P.2d 1369, 1372–73 (Colo. 1979).

As discussed above, section 187 of the Restatement (Second) provides that the law of the state chosen by the parties to govern their contractual rights *will be applied* unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) § 187(1) and (2).  Therefore, even within the analysis under section 187, this Court must consider which state's substantive law would apply.

In the absence of a state statute that governs the choice of law analysis, the factors relevant to the choice of the applicable rule of law include:

> (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied.

*Id.* § 6(2).  In addition, "[i]n the absence of an effective choice of law by the parties," section 188 of the Restatement (Second) provides that the law of the state with the most significant relationship to the transaction and the parties, with respect to the issue at hand, should govern the parties' contractual rights and duties.  *Id.* § 188(1).  In determining what state has the most significant relationship, the court should consider the following factors:

> (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the

contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Id.* § 188(2).  "These contacts are to be evaluated according to their relative importance with respect to the particular issue."  *Id.*  And beneficiaries to a contract are "subject to any limitations imposed by the terms of the contract."  Restatement (Second) of Contracts § 309, cmt. b.

> As noted by the Tenth Circuit, pursuant to section 193:
>
> The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

Restatement (Second) § 193; *Kipling*, 774 F.3d at 1311; *see also Mitchell v. State Farm Fire & Cas. Co.*, 902 F.2d 790, 793 (10th Cir. 1990) ("[I]n jurisdictions following the 'most significant relationship' test, the law of the state in which the insured property, object or other risk is located normally governs issues concerning the validity or effect of the insurance contract.").  The term "casualty insurance" includes, among other things, "liability insurance" and "collision insurance."  Restatement (Second) § 193, cmt. a.  Against these principles, the Court now considers whether Wyoming or Colorado substantive law applies.

**Forum Selection Clause.**  As instructed by section 187 of the Restatement (Second), this Court first considers whether there exists an enforceable choice of law provision within the Policy and agreed to by the Parties.  State Farm contends there is.  Section 14 of the Policy is titled "Choice of Law" and contains the following language: "[w]ithout regard to choice of law rules, the law of the state of . . . Wyoming will control

[with exception] in the event of any disagreement as to the interpretation and application of any provision in this policy." [Doc. 56-1 at 36].[11] The plain language of this provision identifies Wyoming law as controlling.

The Court further finds that this is not a case in which the state designated by the contractual choice-of-law clause has "no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." Restatement (Second) § 187(1). As discussed below, the undisputed facts demonstrate that Wyoming is where Mr. Ganison lived at all times relevant to this action and where the insurance was sought and purchased. Wyoming, the chosen state, thus has a substantial relationship to the Parties and the transaction. *See id.* § 187, cmt. f (the "substantial relationship" requirement is satisfied if one of the parties is domiciled or has its principal place of business in the state of the chosen law, or if the state of the chosen law is where performance by one of the parties is to take place); *cf. Am. Express Fin. Advisors, Inc. v. Topel*, 38 F. Supp. 2d 1233,1238 (D. Colo. 1999). "When the state of the chosen law has some substantial relationship to the parties or the contract, the parties will be held to have had a reasonable basis for their choice." Restatement (Second) § 187, cmt. f.

The second paragraph of section 187 next directs the Court to consider whether the application of Wyoming law would be:

> contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue

---

[11] According to the excepting language, Illinois law will control any disagreement relating to the interpretation and application of the Policy's "(1) Mutual Conditions provision [on the current] Declarations Page," in the instance where State Farm Mutual Automobile Insurance Company issued the policy, and the "(2) Participating Policy provision [on the current] Declarations Page," in the instance where a subsidiary or affiliate of State Farm Mutual Automobile Insurance Company issued the policy. [Doc. 56-1 at 36]. Neither Party argues that this exception applies.

and which, under the rule of § 188, would be the state of the applicable law
in the absence of an effective choice of law by the parties.

Restatement (Second) § 187(2).  Therefore, the Court also considers which state has the greater interest in determining the particular issue, and which state, under the rule of section 188, would be the state of the applicable law absent the choice-of-law provision in the Policy.

*Most Significant Relationship Test.*  This Court begins its analysis under section 188 by considering the contacts specified in section 188(2) and applying the policy considerations enumerated in section 6.  It is clear from the undisputed facts that Wyoming is the location of each of the five events considered in section 188(2).  Plaintiff concedes that he was a Wyoming resident at the time of the Accident; that the Policy was issued in Wyoming; and that the Policy contains a Wyoming choice-of-law provision. [UMF ¶¶ 2, 4, 7]; *see also* [Doc. 63 at 5].  The Policy is a Wyoming Policy Form 9850A. [Doc. 56-1 at 5].  Indeed, Wyoming is implicated in all but two instances:  State Farm is incorporated in Illinois, and Colorado is the situs of the Accident.

Plaintiff's sole argument that Colorado law applies is his assertion that the Accident occurred in Colorado.[12]  However, for purposes of determining the state with the most significant relationship to the *contract*, "facts concerning the location of the accident" are "not relevant to determining choice of law."  *State Farm Mut. Auto. Ins. Co. v. Mendiola*, 865 P.2d 909, 911 (Colo. App. 1993) (rejecting insured's argument that New Mexico law applied because automobile accident occurred in New Mexico; finding Colorado had most

---

[12] Indeed, without more, Plaintiff requests "an opportunity to amend the Complaint to include claims under Wyoming law analogous to those currently alleged under Colorado law," if the Court determines that "Wyoming law applies."   [Doc. 63 at 5].

significant relationship to the contract based on the residency of the insured, where the vehicle was licensed, where the insurance was issued, and where the coverage was intended to apply; and finding that facts concerning the location of the accident "were not relevant in determining choice of law for contract construction").

Section 188(3) of the Restatement (Second) counsels that "[i]f the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203." Restatement (Second) § 188(3).  Indeed, "[i]nsurance policies generally are interpreted under the law of the state where the policy was issued." *TPLC, Inc. v. United Nat'l Ins. Co.*, 44 F.3d 1484, 1491 n.8 (10th Cir. 1995) (quoting *Budd v. Am. Excess Ins. Co.*, 928 F.2d 344, 347 (10th Cir. 1991) (alteration in original)).  "Protection of parties' expectations is a central policy underlying the law of contracts," *Pirkey v. Hosp. Corp. of Am.*, 483 F. Supp. 770, 773 (D. Colo. 1980), and "the needs of an interstate system require respect for contractual choices," *Kipling*, 159 F. Supp. 3d at 1272 (quotation omitted).

The state where the insured is domiciled, and the insured property is located, has "the greatest interest in seeing that its laws apply when interpreting the notice provisions of insurance contracts written and issued" by that state's insurers.  *Id.* (in automobile insurance policy context, the state where insureds reside and vehicle "principally garaged" is "noteworthy") (quoting *TPLC, Inc.*, 44 F.3d at 1491).  Here, the Policy was issued to be compliant with Wyoming law, *see, e.g.*, [Doc. 56-1 at 11, 16, 18, 19, 21]; includes multiple references to Wyoming law, *see, e.g.*, [*id.* at 33, 36, 44]; and states that the premium for the Policy was calculated based, in part, on "[t]he location where [Mr. Ganison's] car is primarily garaged," [*id.* at 34]; *see also* Restatement (Second) § 193,

cmt. b; *Mitchell*, 902 F.2d at 794 ("[T]he location of an insured property is not merely one factor to be balanced against others in determining the law governing the parties' rights under an insurance contract . . . . [I]t is the single most important factor in making this choice of law determination.").

There is no evidence in the record that the Parties either chose or expected Colorado law to govern issues arising under the Policy. *Cf. Mitchell*, 902 F.2d at 794. I find, in consideration of the policies set forth in section 6, that the analysis under section 188 of the Restatement leads to the conclusion that, notwithstanding the choice of law provision, Wyoming is the state "which has a materially greater interest . . . in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." Restatement (Second) § 187(2)(b). Therefore, even absent the choice of law provisions in the Policy, this Court concludes that Wyoming law controls.

**_Whether Application is Contrary to Fundamental Policy of Colorado._** Even if the Court were to determine that Colorado, rather than Wyoming, was the state that had a more significant relationship (which it does not), the Court would override the choice of law provision in the Policy only if the application of Wyoming law would be "contrary to a fundamental policy of Colorado." *Id.* First, the Policy is clear that Wyoming law is the choice of law for disputes arising out of the Policy, except in the limited circumstances as described below that provision, for which Illinois law should apply. *See Brown v. Fryer*, No. 12-cv-01740-CMA-KMT, 2013 WL 1191405, at *3 (D. Colo. Mar. 22, 2013) ("[The insurer and the insured], who entered into the contract, clearly expected that Indiana law would govern, as indicated by the choice of law provision included in the policy."). In the

absence of any argument on this issue, and based on the substantial relationship between the Parties, the Policy, and Wyoming, I do not find that enforcing the choice-of-law provision would contravene a fundamental policy of Colorado.

For these reasons, the Court concludes that Wyoming law governs the interpretation of the Policy and in turn, Plaintiff's breach of contract claim.

### 2.    Statutory Bad Faith

"Once it has been determined that the law of a particular state governs the interpretation of an insurance contract, any statutory insurance claims that implicate performance of the contract must also be raised under the law of the controlling state." *Werden v. Allstate Ins. Co.*, 667 F. Supp. 2d 1238, 1245 (D. Colo. 2009) (citing *Rush v. Travelers Indem. Co.*, 891 F.2d 267, 270 (10th Cir. 1989)); *see also NBH Cap. Fin. v. Scottsdale Indem. Co.*, No. 19-cv-02153-RMR-MEH, 2022 WL 3597118, at *6 (D. Colo. Mar. 30, 2022) (same).  Given that Wyoming law governs interpretation of the Policy at issue in this case, any statutory claims related to performance of the Policy must also be raised under Wyoming law.

### 3.    Common Law Bad Faith

Claims for bad faith breach of an insurance contract are tort claims, and courts analyze these claims separately from contract claims in insurance cases.  *See Price v. Am. Fam. Mut. Ins. Co.*, No. 18-cv-03209-WJM-STV, 2020 WL 948710, at *8 (D. Colo. Feb. 27, 2020).  The "most significant relationship test," set forth in section 145 of the Restatement (Second), applies to courts' choice of law analyses regarding common law bad faith claims. *Richardson v. Allstate Fire & Cas. Ins. Co.*, 637 F. Supp. 3d 1186, 1194 (D. Colo. 2022).  Section 145 of the Restatement (Second) provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) § 145. "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.* Once courts analyze the "relevant contacts" under section 145, courts then turn to the Restatement's "section 6 factors" in concluding which body of law applies to the bad faith claim. *See, e.g., Price*, 2020 WL 948710, at *9–10. The section 6 factors include: (1) the needs of the "interstate and international" systems; (2) the forum's relevant policies; (3) relevant policies of other interested states and their relative interests in determining the particular issue; (4) the "protection of justified expectations"; (5) basic policies "underlying" the field of law; (6) "certainty, predictability, and uniformity" of results; and (7) the "ease" in the determination and application of the applied law. *Id.* (quoting Restatement (Second) § 6(2)). The Court proceeds in its analysis of the factors set forth in sections 145(2) and 6 below, concluding that the factors favor the application of Wyoming law to Plaintiff's common law bad faith claim.

**Section 145 Factors.** First, regarding the place where the injury occurred under section 145(2)(a), the Court disagrees with State Farm's assertion that the first factor

favors the application of Colorado law merely because the "accident occurred in Colorado." [Doc. 57 at 8]. Instead, the Court finds *Price*'s analysis of this factor persuasive. "The injury in a bad faith claim is the destruction of the insured's peace of mind and trust in the insurer, and the economic hardship that might result from not receiving insurance payments." *Price*, 2020 WL 948710, at *9 (citing *Nunn v. Mid-Century Ins. Co.*, 244 P.3d 116, 119 (Colo. 2010)). Mr. Ganison received correspondence from Defendant regarding its coverage decisions at his address in Wyoming, where Mr. Ganison lives and received treatment for his injuries. Thus, while the Accident occurred in Colorado, the injury—for purposes of the Court's choice-of-law analysis under section 145—occurred in Wyoming. *See id.*; *Werden v. Allstate Ins. Co.*, No. 08-cv-02173-LTB-KLM, 2009 WL 1938795, at *3 (D. Colo. July 2, 2009) (factor favored application of the law of the state "where Plaintiff resided at the time of the accident" and the state "where Plaintiff now lives"); *cf. Boone v. MVM, Inc.*, 572 F.3d 809, 813 (10th Cir. 2009) (finding first section 145 factor favored application of Colorado law to wrongful discharge claim where plaintiff "was discharged at the moment he was informed over the telephone, in Colorado").

Second, regarding the place where the conduct causing the injury occurred under section 145(2)(b), it appears that place is neither Colorado nor Wyoming. *See, e.g.*, [Doc. 57 at 8 (Defendant's principal place of business is in Illinois); Doc. 64-1 at 1 (correspondence from Defendant reflecting "Home Office, Bloomington, IL" in header and a Georgia return address)]; *see also Boone*, 572 F.3d at 813.

Third, regarding the "residency" factor under section 145(2)(c), Defendant's principal place of business is in Illinois. [Doc. 57 at 8]. Plaintiff is a resident of Wyoming. [UMF ¶ 2].

Fourth, regarding the place where the Parties' relationship was centered under section 145(2)(d), the Parties' relationship was formed via the Policy. As discussed above, Wyoming has the most significant relationship to the Policy. For bad faith claims, "the 'center' of the relationship must be judged with respect to the parties' locations during the adjustment of the claim. That relationship—from reporting of the claim forward—is the basis of bad faith." *Price*, 2020 WL 948710, at *9. Pre-litigation correspondence from State Farm to Mr. Ganison regarding his claim was addressed to Mr. Ganison at a Wyoming address and reflected a Georgia return address. *See, e.g.*, [Doc. 59-1 at 1 (September 23, 2022 letter from State Farm to Mr. Ganison in Wyoming)]; Doc. 64-1 at 1 (October 23, 2019 letter from State Farm to Mr. Ganison in Wyoming)].[13] Given the nature of Plaintiff's claims, and the Parties' locations while exchanging communications, this factor slightly favors Wyoming. *See, e.g., Price*, 2020 WL 948710, at *9.

In sum, the first section 145 factor favors Wyoming, the second section 145 factor is neutral, and the remaining factors are essentially neutral between the two states or slightly favor Wyoming. However, given that the injury occurred in Wyoming, the first section 145 factor receives more weight than the Court's finding that the second section 145 factor is neutral. *See Mathes v. Patterson-UTI Drilling Co. L.L.C.*, 44 F. Supp. 3d 691, 698 (S.D. Tex. 2014) ("[T]he state of incorporation or location of the defendant's

---

[13] After litigation commenced, communications between the Parties occurred between State Farm and Mr. Ganison's Colorado-based attorney. *See, e.g.*, [Doc. 57-3 at 2 (letter from State Farm to Mr. Ganison's attorney in Colorado dated January 29, 2024)].

principal place of business receives less weight than the place of the injury in the choice-of-law analysis."); Restatement (Second) § 145, cmt. e ("[P]ersons who cause injury in a state should not ordinarily escape liabilities imposed by the local law of that state on account of the injury.").  With this in mind, the Court proceeds to analyze the section 6 factors in determining whether Colorado or Wyoming law applies to Plaintiff's bad faith claim.  *See, e.g.*, *Price*, 2020 WL 948710, at *9–10.

**Section 6 Factors.**  Neither Party offered robust analysis of the section 6 factors as applied to Plaintiff's claims.  Nonetheless, analyzing what argumentation the Parties have provided as applied to the "broad and vague" section 6 factors, the Court concludes that they favor the application of Wyoming law to Plaintiff's bad faith claim.  *Id.* at *10.

Here, the injury occurred in Wyoming. In conducting its section 6 analysis, the Court finds that this fact should be given greater weight in the Court's analysis than the place where the conduct causing the injury occurred.  *See Xcel Energy Servs., Inc.*, 2023 WL 3764640, at *1.  Wyoming has an interest in ensuring that insurers deal in good faith with their insureds, given the "special relationship" between them.  *See Kisselman v. Am. Fam. Mut. Ins. Co.*, 292 P.3d 964, 970 (Colo. App. 2011).  This interest—coupled with the fact that Plaintiff was allegedly injured (by Defendant's conduct) in Wyoming—underscores the weight of Wyoming's relevant policies and interests in enforcing its laws relative to Colorado's interest in the resolution of Plaintiff's common law bad faith claim, even if the Accident occurred in Colorado.  *Compare* Restatement (Second) § 6, cmt. e ("If the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made."), *with* Colo. Rev. Stat. § 10-3-1116(2) (regulating bad faith

for an "insurance policy . . . that is issued in this state"), *and id.* § 10-3-1116(8) ("As used in this section, 'issued in this state' refers to every . . . insurance agreement existing, offered, issued, delivered, or renewed in the state of Colorado . . . to a resident . . . of the State of Colorado . . . notwithstanding any contractual or statutory choice-of-law provision to the contrary.").  Accordingly, after considering the section 6 factors and section 145 factors, the Court concludes that Wyoming law applies to Plaintiff's common law bad faith claim.

### III.   Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (quotation omitted).  It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial. *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).

"[I]t is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit."  *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1110 (10th Cir. 2009).  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point the Court to a lack of evidence for the other party on an essential element of that party's claim.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  Once the movant has met its initial burden, the burden

then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted). To satisfy this burden, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 (4th ed. 2022) (explaining that the nonmovant cannot rely on "mere reargument of his case or a denial of an opponent's allegation" to defeat summary judgment). In considering the evidence, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant." *Adler*, 144 F.3d at 670.

## IV.    Analysis

Pursuant to its choice-of-law analysis, the Court concludes that Wyoming law governs interpretation of the Policy and each of Plaintiff's claims in this action. The Court turns now to consider whether Defendant has satisfied its burden to establish that it is entitled to judgment as a matter of law on Plaintiff's bad faith claims.

### A.    Statutory Bad Faith (Claim One)

Because the Court has determined that the law of Wyoming governs the interpretation of the Policy, any statutory insurance claims that implicate the Policy must also be raised under the law of Wyoming. *See Werden*, 667 F. Supp. 2d at 1245 ("Once it has been determined that the law of a particular state governs the interpretation of an insurance contract, any statutory insurance claims that implicate performance of the

contract must also be raised under the law of the controlling state."); *see also NBH Cap. Fin.*, 2022 WL 3597118, at *6 (same).  Here, however, Plaintiff raises a statutory bad faith claim under Colorado law.  Specifically, Plaintiff's statutory claim is asserted under Colo. Rev. Stat. §§ 10-3-1115 and 1116—for which Wyoming does not have an analog.  Because Wyoming law governs the Policy at issue, Plaintiff's statutory bad faith claim asserted under Colorado law must fail as a matter of law.

Accordingly, Defendant's Motion for Summary Judgment is **GRANTED** with respect to Claim One.

### B.    Common Law Bad Faith (Claim Two)

State Farm also seeks summary judgment on Plaintiff's common law bad faith claim.  [Doc. 57 at 11–12].  As discussed above, in determining whether Defendant is entitled to summary judgment, the Court must apply Wyoming law to Plaintiff's common law bad faith claim.

In the insurance context, Wyoming law distinguishes between substantive bad faith claims that implicate the merits of the insured's claim for coverage and procedural bad faith claims that allege "oppressive and intimidating claim practices."  *Hatch v. State Farm Fire & Cas. Co.*, 842 P.2d 1089, 1099 (Wyo. 1992); *Sonnett v. First Am. Title Ins. Co.*, 309 P.3d 799, 806–07 (Wyo. 2013) (stating that an insurer acts in bad faith where the substantive validity of a denied claim is "not fairly debatable" (i.e., substantive bad faith), and also "by the manner in which it investigates, handles or denies a claim" (i.e., procedural bad faith) (quotation omitted)); *see also Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 857 (10th Cir. 2015) (acknowledging that Wyoming law recognizes both varieties of bad faith).

Defendant's arguments relate exclusively to substantive bad faith.  [Doc. 57 at 12 ("[U]nder the law of Wyoming," Mr. Ganison "must show:  (1) the absence of any reasonable basis for denying a claim for benefits; and (2) the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim for benefits" (quotation omitted))].  In Wyoming, "[t]he test used in determining whether a claim was denied in bad faith is an objective one which questions whether the validity of the denied claim was not fairly debatable."  *Saddletree Holding, LLC v. Evanston Ins. Co.*, No. 23-8024, 2024 WL 1883901, at *4 (10th Cir. Apr. 30, 2024) (quoting *State Farm Mut. Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 825 (Wyo. 1994)).  "A claim [is] 'fairly debatable' when a reasonable insurer would have denied or delayed payment of benefits under the facts and circumstances."  *Ahrenholtz v. Time Ins. Co.*, 968 P.2d 946, 950 (Wyo. 1998).

State Farm asserts that, in its most recent evaluation of Mr. Ganison's claim, State Farm added special damages (including medical bills considered and economic damages); past wage loss; and damages for pain and suffering, inconvenience, physical impairment and disfigurement, and loss of consortium, for a subtotal of $40,062.79.  Then, State Farm applied an MPC offset ($17,927.66), yielding a total of $22,135.13.  Because this total was less than the $25,000 that State Farm paid to Mr. Ganison in UM benefits, and because the Policy contains a non-duplication provision, State Farm argues that nothing more is owed to Mr. Ganison.  And according to State Farm, "[t]here is no evidence of any kind in this case showing State Farm was cognizant that its ultimate liability was necessarily going to exceed the amount it already paid to Mr. Ganison, $25,000 for the UM claim and $17,927.66 in MPC benefits."  [Doc. 57 at 12].

The Court is respectfully unpersuaded that this argument entitles Defendant to summary judgment on Plaintiff's bad faith claim. Plaintiff's bad faith arguments hinge, at least in part, on the timing of State Farm's investigation and handling of Plaintiff's claim upon learning that Plaintiff was receiving ongoing treatment. Indeed, Plaintiff's Response incorporates by reference various claim notes addressed in another section of the Response to argue that the claim notes

> demonstrate Defendant's State Farm's actual knowledge that the Plaintiff was still treating a month and a half prior to the statute; however, instead of immediately investigating and making sure the benefits were given, the Defendant waited **20 days** before furthering the investigation. This unreasonable delay essentially backed the Plaintiff into a corner, as he was unaware of the statute of limitations until just 25 days prior to it running and his treatment no longer being covered. The Defendant had no reason to wait 20 days given how tight the time was between becoming aware of the Plaintiff's ongoing treatment and the upcoming statute. Given the September 2, 2022, claim note includes language that "statute will run out in Oct," the Defendant clearly had knowledge they were delaying/denying the claim without any reasonable basis for the delay.

[Doc. 63 at 9–10 (citation omitted)]. Under Wyoming law, Plaintiff may proceed on a theory of procedural bad faith if he can establish "oppressive and intimidating claim practices," *Hatch*, 842 P.2d at 1099, such as:

> Deliberately misrepresent[ing] policy provisions to defeat coverage; ma[king] oppressive demands or impos[ing] burdensome requirements not contained in the policy; retaliat[ing] against the insureds in any way; unfairly impos[ing] premium increases; forc[ing] insureds] to arbitrate or litigate, knowing that it had no substantial grounds to reject the claim; requir[ing insureds] to continue premium payments while it reviewed their claim; or undert[aking] any other action for which insurers have been held liable in first-party bad faith claims.

*Ahrenholtz*, 968 P.2d at 951 (citing *Hatch*, 842 P.2d at 1097). Insofar as Plaintiff faults Defendant for running the clock down as the cutoff for Plaintiff's ability to recover MPC benefits drew near, and "essentially back[ing] the Plaintiff into a corner," [Doc. 63 at 9], his theory of bad faith is procedural.

In other words, the Parties have argued past each other; Defendant's arguments implicate the merits of Mr. Ganison's claim for coverage, whereas Plaintiff's arguments implicate Defendant's claim-handling practices. *Thompson v. Protective Ins. Co.*, No. 12-cv-00148-F, 2013 WL 11834242, at *7 (D. Wyo. Apr. 24, 2013) ("The Wyoming Supreme Court has recognized a distinction between insurance bad faith claims that implicate the merits of the insured's claim for coverage and those alleging 'oppressive and intimidating claim practices.'" (quoting *Hatch*, 842 P.2d at 1099)).   Defendant bears the burden of establishing that Plaintiff's claim lacks merit. *Alpine Bank*, 555 F.3d at 1110.  However, Defendant fails to meet even its initial burden to "point the Court to a lack of evidence . . . on an essential element of [Plaintiff's] claim," *Adler*, 144 F.3d at 671, because its substantive bad faith arguments are immaterial to procedural bad faith, and Plaintiff pleads both theories under Wyoming law,  *see Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002) ("Before the burden shifts to the nonmoving party to demonstrate a genuine issue, the moving party must meet its 'initial responsibility' of demonstrating that no genuine issue of material fact exists and that it is entitled to summary judgment as a matter of law.").

Indeed, State Farm has "misperceived the scope of [the insured's] bad faith claim." *Bergantino v. State Farm Mut. Auto. Ins. Co.*, 500 P.3d 249, 258 (Wyo. 2021) (quoting *Michael v. Stock*, 162 A.3d 465 (Pa. Super. Ct. 2017) (brackets in original)).  Here, Mr. Ganison "did not limit [his] claim to [the insurer's] denial of coverage and refusal to provide [p]olicy benefits, but also complained regarding the claims handling conduct which occurred."  *See id.* (quoting *Michael*, 162 A.3d at 479–80, distinguishing the pleadings in *Michael* from the plaintiffs' complaint in *Bergantino*, and concluding that only *Michael*

demonstrated correct pleading of a bad faith processing claim) (brackets in original). Under the *Michael* standard, as articulated by the Wyoming Supreme Court in *Bergantino*, the Court concludes that the Amended Complaint "demonstrates a correct pleading of a claim based upon an insurer's bad faith in processing a claim." *Id.* at 258–59.

Additionally, the Court notes that its review of the entire record in this case, *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."), reveals even more disputes of material facts regarding the fairness and adequacy of State Farm's investigation of Plaintiff's UIM claim and whether State Farm's conduct fell short of industry standards. *See generally* [Doc. 56 and Doc. 59 and their accompanying exhibits]. Thus, Defendant has not met its burden, and judgment in State Farm's favor on Plaintiff's common law bad faith claim is not warranted. *See Thompson*, 2013 WL 11834242, at *7–8 (denying motion for summary judgment on procedural bad faith claim); *cf. Bergantino*, 500 P.3d at 258 (holding that plaintiff insureds "[could not], as a matter of law, meet the requirements for showing a bad faith delay in payments" and "did not independently allege that State Farm committed bad faith in responding to or processing their UIM benefits claims other than by failing to timely pay the benefits"); *199 E. Pearl Condo. Owners Ass'n v. Acuity Ins. Co.*, No. 22-8059, 2023 WL 4145408, at *7–10 (10th Cir. June 23, 2023) (affirming grant of summary judgment for insurer on common law bad faith claim where insured failed to present triable questions under theories of substantive or procedural bad faith). Accordingly, the Court **DENIES** the Motion with respect to the common law bad faith claim asserted in Claim Two.

## V.    Plaintiff's Request for Leave to Amend

Finally, the Court notes that Plaintiff's Response to the Motion for Summary Judgment seeks leave to further amend Plaintiff's Amended Complaint to reflect Wyoming law. [Doc. 63 at 5, 10]. As an initial matter, Local Rule 7.1 provides that "[a] motion shall not be included in a response or reply to the original motion. A motion shall be filed as a separate document." D.C.COLO.LCivR 7.1(d). Plaintiff has not sought leave to amend in a properly filed, separate motion for relief compliant with D.C.COLO.LCivR 15.1. In addition, this Court finds that no amendment to the Complaint is necessary, as the elements of the remaining claims for breach of contract and common law bad faith are substantively similar under Wyoming and Colorado law. Accordingly, the Court respectfully **DENIES** leave to further amend the Amended Complaint.

## CONCLUSION

For the reasons set forth herein, it is **ORDERED** that:

(1)    Defendant's Motion to Strike [Doc. 55] is **GRANTED**;

(2)    Defendant's Motion to Exclude [Doc. 56] is **GRANTED IN PART** and **DENIED IN PART**;

(3)    Defendant's Motion for Partial Summary Judgment [Doc. 57] is **GRANTED IN PART** and **DENIED IN PART**;

(4)    Claim One of Plaintiff's Amended Complaint [Doc. 34] is **DISMISSED with prejudice**; and

(5)    A telephonic Status Conference is **SET** for **October 3, 2024 at 11:00 AM** for purposes of setting a Final Pretrial/Trial Preparation Conference and trial in this matter. The Parties shall participate using the following dial-in information: **888-363-4749; Access Code: 5738976#**.

DATED:  September 9, 2024

BY THE COURT:

Nina Y. Wang
United States District Judge